**FARMERS STATE BANK, Respondent,**

v.

**W. M. STEWART d/b/a Stewart Sale Pavilion, Appellant.**

**No. 54636.**

Supreme Court of Missouri,
En Banc.

June 8, 1970.

William H. Sanders, Dean F. Arnold, James Borthwick, Kansas City, for appellant; Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, of counsel.

J. B. Beavers, Cameron, for respondent.

SEILER, Judge.

This case involves a claim in conversion by plaintiff bank against defendant Stewart, who operates a sales pavilion in Cameron, where livestock is bought and sold with defendant acting as auctioneer and charging a commission on each sale.[1] Defendants Leroy and Janice Davis borrowed

---

1. Defendant Stewart said from 500 head "on up" of livestock pass through the sales barn on an average sale day.

$1,648 from plaintiff, giving their note and chattel mortgage, dated January 20, 1964, in return. In the Davis mortgage there was livestock as follows:

> "Thirteen head of Cattle described as follows:
>
> One Holstein Cow, age 5 years
>
> Three Whiteface Heifer calves
>
> Four Holstein calves (2 steers, 2 heifers)
>
> One Jersey steer
>
> one red steer  (Av. Wt. of all calves 450 Lbs.)
>
> 3 Angus Calves"

---

Defendants James and Mary Thompson borrowed $2,000 from plaintiff bank, giving in return their note and chattel mortgage, dated September 5, 1965, covering livestock and equipment, the livestock being described as follows:

> "Nine Holstein Cows, Age 2–7 years
>
> *Tow* Jersey Cows, Age 4 years"

Both mortgages were recorded in Clinton County, the place of residence of the mortgagors and location of the cattle. The mortgagors defaulted. Plaintiff bank contends some of the livestock covered under the two mortgages was wrongfully sold by the mortgagors through defendant Stewart's sales pavilion, allegedly to its damage in the sum of $675.35, for which amount plaintiff obtained judgment in the trial court against defendant Stewart, following a trial before the court without a jury. Apparently service of process was never obtained on the defendant mortgagors. Defendant Stewart appeals.

Defendant Stewart's answer denied plaintiff's allegations, except as to his operating a livestock sales pavilion. He also pleaded the Packers and Stockyards Act, 7 U.S.C.A., Secs. 201–217,[2] alleging he was required thereunder to receive and sell for commission without discrimination any and all livestock consigned to him, comparing the situation to a public utility which must render service to all who apply.

The trial court made findings of fact and conclusions of law. It found defendant Stewart was operating as a market agency under the Act, that Stewart had constructive, but not actual, notice of plaintiff's lien and that the description of the livestock in the mortgages was sufficient to give notice. The court also found that what defendant Stewart did with the Davis and Thompson livestock was to receive and sell it, receive the proceeds in his name, deliver the livestock to the purchaser, deduct an inspection charge, an insurance charge and commission, and remit the balance to the seller. Both sides proceeded on the assumption that the cattle thus sold were among the animals covered by the mortgages.

The trial court also found there was evidence of negligence on the part of defendant Stewart in not making reasonable requirements of Davis and Thompson establishing their ownership and title to the livestock involved, but no such allegation was made by plaintiff in its petition, nor was a negligence issue actually tried in the trial. Respondent makes no effort to support the trial court on this issue and in our

---

2. This act, as worded at the times here material, makes it the duty of every stockyard owner and market agency to furnish upon reasonable request, without discrimination, reasonable stockyards services.

opinion, if the judgment is to be affirmed it will have to be on the conversion theory rather than on any negligence theory.

The case went first to the Kansas City Court of Appeals, which reversed the judgment, but transferred the case here under Art. V, Sec. 10, 1945 Constitution, V.A.M.S. and Rule 84.05, V.A.M.S., because of the general interest and importance of the questions involved. One question posed is whether under the Packers and Stockyards Act, the defendant is absolutely immune from liability to the mortgagee for livestock sold by him at his sale barn in the usual course of business, absent actual knowledge of the existence of the mortgage. The other question is as to the sufficiency of the description of the cattle in the two mortgages. Under the constitutional provisions, supra, the case is for final determination here, the same as if here on original appeal.

■ Under the Missouri authorities, which are well collected and analyzed in "Description of the Property in a Missouri Chattel Mortgage", 1951 Wash.U.L.Q. 572, and Fisher v. Mikco Grain Co. (Mo.App.) 404 S.W.2d 752, 753–755, we hold the description of the animals contained in the two mortgages was sufficient. There was a statement of the quantity of the property mortgaged and description of physical characteristics. The cattle were referred to by number, breed, gender, age, color, and weight. Each mortgage stated that the property listed belonged to the mortgagor and was then in the possession of the mortgagor. Each mortgage gave a definite place of location of the property on a particular farm within Clinton County. Each mortgage stated that the described property was all of the property of that description located at the place named, or which was to be purchased with the proceeds of the

loan and moved to the place named. Armed with this information, a third person, making the reasonable inquiries which the mortgages themselves suggest, could identify the animals referred to in the mortgages. So the descriptions were sufficient to put defendant Stewart on constructive notice and he would be guilty of conversion by selling the mortgaged property in which the plaintiff bank had an interest, unless defendant Stewart is excused or immune by virtue of the Packers and Stockyards Act.

■ Defendant relies mainly on Blackwell v. Laird, 236 Mo.App. 1217, 163 S.W. 2d 91, where the Kansas City Court of Appeals, in 1942,[3] held that a stockyards commission merchant, operating under the Packers and Stockyards Act, was not liable in conversion where it sold livestock upon the application of a person presenting himself in possession but who turned out not to be the true owner. The court based its decision mainly on the proposition that commission merchants operating under the Act are public utilities, hence bound to render to the public the services required, and so it would be unjust to require them to sell cattle and at the same time hold them liable if the person bringing the goods were not the true owner. The court said it would follow public utility law and referred to a Missouri decision, Nanson v. Jacob, 93 Mo. 331, 6 S.W. 246, an 1887 case, holding that a common carrier is not liable in conversion where it receives and forwards goods tendered in the usual course of business, and to a Kentucky decision, Abernathy v. Wheeler, 92 Ky. 320, 17 S.W. 858, decided in 1891, holding a public warehouseman not liable in conversion for storing and selling tobacco delivered to it by a person not holding title. The Blackwell opinion also referred to Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.

---

3. Defendant also cites Cresswell v. Leftridge (Mo.App.) 194 S.W.2d 48, decided in 1946 by the Springfield Court of Appeals, another cattle conversion case, where the court cited Blackwell v. Laird. However, the Cresswell case does not re-

ly on Blackwell and the decision was not placed on the proposition that under the Packers and Stockyards Act a sales barn operator is immune from liability in a case such as the one before us.

Ed. 735, and quoted the remark of the United States Supreme Court at 258 U.S. 516, 42 S.Ct. 402 that "The act, therefore, treats the various stockyards of the country as great national public utilities to promote the flow of commerce from the ranges and farms of the West to the consumers in the East. \* \* \*" On the strength of this statement, which would appear to be more a figure of speech than a declaration of law, the Blackwell court concluded it should apply common carrier law to the commission merchant before it. However, we do not believe the quoted portion of the United States Supreme Court opinion carried any such implication. The Supreme Court had before it the constitutionality of the Packers and Stockyards Act. The quoted remark was made in the course of demonstrating that the great stockyards of the country, particularly those which the evidence showed were controlled by the "Big Five" packers—Swift, Armour, Cudahy, Wilson, and Morris—and which took numerous unfair advantages of shippers, were in interstate commerce and so closely associated with it as to make them subject to national regulation under the commerce clause. The question of whether stockyards were literally public utilities was not before the Supreme Court and the quoted statement was not necessary to the decision.

In holding that the Packers and Stockyards Act provides this sort of immunity to the commission merchant or sales barn operator, the Kansas City Court of Appeals has attributed to the federal act a result not found within its terms or intent by any federal appellate court or by any state court of last resort and seems to have overlooked several significant features of the Act.

For example, in Allen C. Driver, Inc. v. Mills, 199 Md. 420, 86 A.2d 724, where the facts are almost identical with the facts in the Blackwell case, the court, in rejecting the argument advanced in Blackwell said as follows at 86 A.2d 726–727: "While it is a general principle that a public utility is

under a legal obligation to render adequate and reasonably efficient service impartially and without unjust discrimination, a market agency is certainly not required to handle stolen livestock or livestock to which the title is defective. We assume that an agency could demand that any person desiring to deal with it must establish his identity and his title to the livestock which he offers for sale. We cannot assume that Congress enacted the Packers and Stockyards Act to protect the operation of stockyards for handling property that has been stolen or obtained by fraud. The Act unquestionably makes it the duty of market agencies to furnish 'upon reasonable request' without discrimination reasonable stockyard services. But to refuse to cooperate with a criminal in his crime is not 'wrongful discrimination'. Nor is a request that an agency dispose of property stolen or fraudulently obtained a 'reasonable request'.

"It may be observed that Section 217a [of the Act] permits the charging of a fee, when authorized by the Secretary of Agriculture, for the inspection of brands or marks of livestock shipped from a State in which branding or marking prevails. The Act declares that the inspection is 'for the purpose of determining the ownership of such livestock'. This provision, giving the agencies one means of protecting themselves, is indicative of the intent of the Act that the market agencies should be on guard against conversion.

"Although the Act does burden the operations of commission agencies to some extent, as they are supervised by the United States Department of Agriculture in Washington, we do not think that it necessarily follows that Congress intended to relieve such agencies from liability in tort for conversion, and thus abrogate the inveterate law of the State. The Act was passed to remedy the abuses that had grown up in the large stockyards in various parts of the country whereby raisers and shippers of livestock were charged excessive and discriminatory rates for serv-

ices rendered in handling and selling the livestock after reaching the yards. There is nothing in the Act to indicate that Congress intended to protect market agencies or purchasers at the stockyards from liability on account of fraudulent sales of livestock either not owned by the consignors at all or covered by chattel mortgages."

In Blackwell, the court considered Mason City Production Credit Ass'n. v. Sig Ellingson & Co., 205 Minn. 537, 286 N.W. 713, 716, quoting the following passage: " * * * There is no indication in the history of this legislation nor in the act itself of an intention to shield either purchasers or market agencies from liability on account of wrongful sales in the stockyards of livestock not owned by the consignors or covered by chattel mortgages of which the purchasers or market agencies may be in fact ignorant. Courts should be slow to conclude that the act was designed to supersede local law respecting the force and effect of chattel mortgage security upon livestock received at public stockyards", but rejecting the Minnesota court's interpretation of the act. However, the Supreme Court of Washington, in Moderie v. Schmidt, 6 Wash.2d 592, 108 P.2d 331, in refusing to hold the Packers and Stockyards Act exempted the livestock commission merchant from liability on conversion where it made a sale in the absence of any notice of defect in the consignor's title, discussed the Mason City Production Credit Ass'n. case and the above quotation, and pointed out that when certiorari was sought and denied in the United States Supreme Court, 308 U.S. 599, 637, 60 S.Ct. 130, 84 L.Ed. 501, the Solicitor General of the United States appeared in the Supreme Court and opposed the granting of the writ, from which the Washington court concluded, 108 P.2d l. c. 334, " * * * It seems reasonable to infer that the decision of the Minnesota Supreme Court was satisfactory to the federal authorities charged with the administration of the Packers and Stockyards Act."

In United States v. Matthews (C.C.A. 9) 244 F.2d 626, another case involving a conversion action by the mortgagee against a market auctioneer who sold mortgaged cattle at the request of the mortgagor, without any actual knowledge of plaintiff's lien, the court refused to follow Blackwell v. Laird, supra, saying it did not believe Blackwell was correctly decided, 244 F.2d l. c. 630. The court emphasized that Sec. 205 of 7 U.S.C.A., the Packers and Stockyards Act, is phrased in terms of the market agency's duty being to furnish upon *reasonable* request, without discrimination, *reasonable* stockyard services. It referred with approval to the case of Birmingham v. Rice Bros., 238 Iowa 410, 26 N.W.2d 39, a case involving action by conversion by the owner of cattle against the commission merchant who had sold the cattle for a man who got them from plaintiff on the strength of a worthless check. The commission merchant asserted the Packers and Stockyards Act as a defense, particularly Sec. 205 thereof. In rejecting this contention, the court said at 26 N.W.2d l. c. 43: "Certainly, Congress did not adopt the Packers and Stockyards Act to encourage and protect the operation of fences for handling property stolen or procured by fraud. The Act merely makes it the duty of such agencies to furnish upon *reasonable request without discrimination* reasonable stockyards services. It is not wrongful *discrimination* to refuse to aid a criminal in his crime, nor is a request that one dispose of property fraudulently procured or stolen a *reasonable request*." [To which, in our opinion, can be added, "or property mortgaged and being illegally offered for sale by the mortgagor."]

In Sig Ellingson & Co. v. De Vries (C. C.A. 8) 199 F.2d 677, 678–679, in considering whether the Packers and Stockyards Act avoided the state law of Iowa and Minnesota with respect to liability imposed on livestock commission merchants for selling cattle for principals who were not the owners by likening commission merchants to public utilities, the federal appellate

court held that Congress had no such intention. The court said: "The gist of the argument in the trial court and on the this appeal is that the federal Act recognizes and treats the stockyards and market agencies as public utilities and imposes regulations in respect to them as such. Particularly, it requires the agencies to observe non-discriminatory practices in respect to the furnishing of stockyard and marketing services and prohibits unjust, unreasonable or discriminatory practices. It is argued that prior to the Act the commission merchants were free to choose their customers, but that they have been deprived of that freedom by the requirements of the Act. Assuming that the law of a State held a commission man liable under the circumstances of this case when he had such freedom to choose his customers, the contention is that by taking away such freedom Congress must be deemed to have removed the liability. It is also stressed that other public utilities such as railroads and warehousemen are not held liable when they innocently and in good faith handle goods for a principal who has obtained possession by means of a bad check.

"But it appeared to the trial court that the liability of the defendant market agency to plaintiffs which resulted from its sale of the cattle under the law of Iowa and of Minnesota was not affected either by the terms or by necessary implications of the federal Act. The services performed by the market agencies were in the nature of public utility services vitally necessary to the movement of livestock in interstate commerce before the passage of the Packers and Stockyards Act. It was on that ground that Congress had and exercised the power to regulate them for the prevention of unjust discriminations and abuses. But Congress made no attempt to declare who should be deemed the owner of cattle turned over for a bad check nor to relieve the market agencies from liability imposed by State law for selling cattle for principals who were not the owners. The Act was aimed at unjust discriminations incompatible with public utility operations, but it in no wise impairs the freedom of the market agencies to adopt proper measures to prevent and suppress frauds. The court was convinced that the Act has not superseded the law of Iowa or of Minnesota under which the defendant in this case became liable to the plaintiffs."

" * * * We find no error in the conclusion of the trial court that the Packers and Stockyards Act does not, either by express provision or by necessary implication, establish the rights of the parties to this action resulting from the sale of the 33 head of cattle. * * * "

In United States v. Union Livestock Sales (C. C. A. 4) 298 F.2d 755, there was an action in conversion by the United States against an auctioneer who sold two cows in West Virginia which were covered by a chattle mortgage recorded in Ohio in favor of the Farmers Home Administration. The proceeds of the sale were transmitted to the mortgagor at whose instance the cows were sold, so the factual situation is close to the case at bar. One argument advanced for the defendant was that since the auctioneer was operating a public market under a West Virginia statute, subject to regulation by the commissioner of agriculture, with the statute declaring that such markets are "affected with a public interest and subject to regulation by the state for the general welfare", there should be no liability, likening the situation to cases arising under the Packers and Stockyards Act and citing Blackwell v. Laird, supra. However, the court rejected this, saying at 298 F.2d l. c. 760: " * * * The majority of the decisions in this field, however, do not follow this line since they find no indication in the statute that it was meant to alter the common law rules of liability, pointing out that the marketing agency is obliged to grant only such requests as are reasonable and not those which relate to goods that the proposed seller has no right to sell. * * * "

The federal court in the foregoing case also stressed the desirability ·of having

state law control in cases where transfers of private property are made by local lenders and owners in accordance with state law in the course of business transactions, rather than attempting to govern such matters by the effect of a federal statute. The federal court pointed out the local rules governing dealings in the transfer of property have been built up by experience in like transactions and are familiar alike to the courts and the citizens locally. These are sound observations and they should apply here.

In Missouri, the common law doctrine of passage of title by purchase in market overt, Case of Market Overt, Coke's Reports, Vol. 3, Part V–83b, Hil. 38 Eliz., was never adopted, Koch v. Branch, 44 Mo. 542, 544. The almost universally accepted rule is that an agent, factor, commission merchant or auctioneer who receives property from his principal and sells it and pays the proceeds of the sale to him is guilty of conversion if the principal has no right to sell the property, even though the agent acts without knowledge of the defect in the title. See 15 Am.Jur.2d, Chattel Mortgages, Sec. 158, pp. 327–28; Restatement of Agency, Second, Sec. 349 and Appendix pp. 575–6; Restatement of Torts, Second, Sec. 233; Commercial Credit Corp. v. Joplin Automobile Auction Co. (Mo.App.) 430 S.W.2d 440, 445; 96 A.L.R.2d 208. In Mohr v. Langan, 162 Mo. 474, 63 S.W. 409, 416, the court quotes with approval from an English case as to the evils which flow from relaxing the accountability of factors and agents such as sales barn operators, as follows: " * * * No one should buy property without good reason to believe that the seller has a right to sell it. The loose habit that prevails of

buying everything that is offered is but a bounty to theft.[4] If thieves found purchasers less eager for cheap bargains, though from total strangers, they would find it less easy to follow their vocation. Public policy, as well as private right, demands that the settled rule that no title can pass through a thief should not be relaxed, and those who buy it of him should be compelled to give up the property, unless they have converted it, when they should be held for its value. Factors and agents, also, should be held to the same accountability. It is their duty to know for whom they act, and whether they can be saved harmless if their action shall amount to a conversion of another's property. * * * * " [5]

■ And, of course, if the mortgagee is given the right to take possession upon removal or sale of the property (as was provided by the mortgages here), its removal or sale constitutes a conversion for which he may sue, National Bank of Commerce v. Morris, 114 Mo. 255, 21 S.W. 511. See also Sec. 400.9–503, V.A.M.S.

■ We can see no good reason for relaxing the above stated general rules in the situation before us. The chattel mortgages here were admittedly properly recorded. Under Sec. 443.460, RSMo 1959, as in force at the time the Davis chattel mortgage was made, such recording was "notice of the contents thereof to all the world", so defendant Stewart had constructive knowledge that Davis had no right to sell the cattle which he presented for that purpose. The loan by the bank, execution and recording of the chattel mortgage, residence of the mortgagors, location of the cattle, sale of the cattle, and place of loca-

---

4. Parenthetically we observe the bounty is enhanced by the rule of Blackwell v. Laird, supra, as means of transportation improve. Modern day cattle thieves or convertors, using today's trucks and highways, can rustle cattle at point A by night and offer the same for sale at point B several hundred miles away by the next morning.

5. The action of the sales barn operator in the case at bar went beyond taking charge of the cattle as a mere depositary. The defendant Stewart took charge of the cattle with the intention of handling them in such a way—namely, by selling them—that some third person would acquire a proprietary interest in them. This is a serious invasion of the rights of the lienholder.

tion of defendant Stewart's sales barn were all in the same county.[6]

As pointed out earlier, none of the other appellate courts, state or federal, have gone along with Blackwell v. Laird's conclusion that it was the intent of Congress to make sales barn operators who are under the Packers and Stockyards Act immune from liability under local law for unauthorized sale of mortgaged cattle. There is an annotation on the subject, "Liability of factor or other market agency to true owner of property received from third person, as affected by the Federal Packers and Stockyards Act", 2 A.L.R.2d 1124, wherein it is stated: "All but one of the cases which have been found to be within the scope of the annotation hold that the Packers and Stockyards Act does not absolve the factor or market agency from liability for conversion." Included in the states so holding, where cattle, mortgage loans on cattle, and sales of cattle are probably no less important than they are in Missouri, are Iowa, Birmingham v. Rice Bros., 238 Iowa 410, 26 N.W.2d 39; Kansas, Citizens State Bank of Dalhart v. Farmers Union Livestock Co-op. Co., 165 Kan. 96, 193 P.2d 636; Texas, Walker v. Caviness, Tex.Civ.App., 256 S.W.2d 880; Minnesota, Mason City Production Credit Ass'n v. Sig Ellingson & Co., supra; Maryland, Allen C. Driver, Inc. v. Mills, supra; South Dakota, First National Bank of Pipestone v. Siman, 67 S.D. 118, 289 N. W. 416; Washington, Moderie v. Schmidt, supra; Montana, O'Connell Ranch Co. v. Great Falls Livestock Commission Co., 136 Mont. 23, 343 P.2d 703. We are not bound by these decisions from other states, but they are most persuasive.

■ A federal district court sitting in Oregon, in rejecting the proposition that the Act gave immunity to the local sales barn operator, Seymour v. Austin (D.C.D. Ore.) 101 F.Supp. 915, called attention to the significance of Title 9, Code of Federal Regulations, Sec. 201.39 of the regulations of the Department of Agriculture promulgated by the Secretary as authorized by Sec. 203 of the Act. We take judicial notice of said code, 44 U.S.C.A. Secs. 1507, 1510. Sec. 201.39 provides that no market agency shall pay the net proceeds from the sale of any livestock to any person other than the consignor, *except*

6. Sec. 443.460, supra, was repealed by Laws 1963, p. 637, which provided the Uniform Commercial Code would become effective July 1, 1965. The Thompson chattel mortgage in the present case was not made until September 3, 1965, so it would be governed by the Uniform Commercial Code, although no mention was made by the trial court or the parties in their briefs of any Code provisions, while the Davis mortgage, having been made January 20, 1964, would continue to be governed by the prior law, Sec. 400.10–101, V.A.M.S. However, the two chattel mortgages came into evidence without objection and defendant made no contest as to recording, so we assume there is no issue as to proper filings having been made with respect to the Thompson mortgage (one of the Thompson cows was sold), the same as with the Davis mortgage (eight of the Davis cows were sold).

The provisions of the Uniform Commercial Code do not require application to the conversion claim on the sale of the Thompson cow of rules any different from those stated with respect to conversion of the Davis cows. The holder of the perfected security interest has the same protection under the Code as he had under the chattel mortgage law and the sales barn operator is still liable for conversion of the collateral. See Clovis National Bank v. Thomas, 77 N.M. 554, 425 P.2d 726, 729; also Sec. 400.9–201, V.A. M.S., and Comment: " * * * In general the security agreement is effective between the parties; it is likewise effective against third parties * * * "; Sec. 400.9–301, V.A.M.S.; Sec. 400.9–306 (2), V.A.M.S., and Comment 3: "In most cases when a debtor makes an unauthorized disposition of collateral, the security interest, under prior law and under this Article, continues in the original collateral in the hands of the purchaser or other transferee. That is to say, since the transferee takes subject to the security interest, the secured party may repossess the collateral from him or in an appropriate case maintain an action for conversion * * * "; Sec. 400.9–503, V.A.M.S.

where "such person holds a *valid, unsatisfied mortgage or lien* upon the particular livestock \* \* \*" (emphasis ours). While the rules of the Secretary of Agriculture do not have the standing or force of statutes, the rule is completely inconsistent with the idea that Congress' intent was to abrogate local law as to chattel mortgages, or to cut off the rights of the holder of a properly recorded chattel mortgage as against the market agency. To the contrary, the interpretation and position of the Department of Agriculture, the agency most experienced in the administration of the Act, is that the holder of the chattel mortgage is to be protected.

■■ Finally, we are not impressed by the argument that a decision in favor of the mortgage holder here would be to place an impossible burden or cost of doing business on the sales barn operator. We observe defendant Stewart testified without objection that he carried insurance "for the very purpose to cover the situation in this lawsuit". The court found as a fact that Stewart deducted an insurance charge from the proceeds of the sale. The sales sheet which Stewart gave the consignor has a space for "Insurance" charge and shows the exact amount so charged. While we cannot determine liability on the basis of whether a defendant does or does not have mortgage or conversion liability insurance to cover his loss, the matter of whether the sales barn operator provides for such insurance as part of his charges for his services does bear on the question of whether he considers the risk of claims such as we have here as part of his cost of doing business and how he handles it. It is apparent this is a risk which the sales barn operator can insure against and the cost of which he passes on to the customer. The sales barn operator does not offer his services gratuitously. He is in business to make a profit and earn commissions from the sale of cattle involved. He had it within his power to protect himself against such losses as incurred in the present case and by his own testimony, took steps to do

so. Certainly it does not appear that sustaining the judgment of the trial court here is likely to set a precedent which would as a practical matter force him out of business. The Secretary of Agriculture must take into consideration reasonable operating expenses of the sales barn in fixing reasonable rates, St. Joseph Stockyards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033; Acker v. United States, 298 U.S. 426, 56 S.Ct. 824, 80 L.Ed. 1257; Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524, and if experience shows mortgage or conversion insurance is needed to operate it would be a part of the reasonable cost of doing business just as much as fire insurance would be.

■ We are of the opinion that the judgment of the trial court should be affirmed. Blackwell v. Laird, supra, to the extent it is inconsistent with this opinion is overruled and no longer to be followed.

Judgment affirmed.

All concur.

BARDGETT, J., not participating because not a member of the court when cause was submitted.