**Ira E. ENSMINGER and Esther Ensminger, Appellants,**

v.

**Elroy BURTON, E.H. Fowler and Warsaw Auction Co., Respondents.**

No. WD 42594.

Missouri Court of Appeals, Western District.

Jan. 15, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 5, 1991.

Application to Transfer Denied April 9, 1991.

Kenneth O. McCutcheon, Jr., Versailles, for appellants.

Peggy D. Richardson, Jefferson City, for respondents.

Before KENNEDY, P.J., and SHANGLER and GAITAN, JJ.

SHANGLER, Judge.

The plaintiffs Ensminger brought an action for the conversion of their cattle against the defendants livestock auction facilities, Warsaw Auction Company and the partnership Burton and Fowler, doing business as Central Missouri Sales Co. The claim was tried to the court and was determined in favor of the defendants. The court entered findings of fact and conclusions of law with the judgment. The plaintiffs Ensminger appeal.

The Ensmingers are cattle breeders, and in January of 1980 sold $27,000 worth of cattle to one Lawrence Arnold, and took a security interest in the cattle. They did not know Arnold, who also raised livestock and bought and sold cattle on a regular basis. The Ensmingers assumed that Arnold was a farmer and that the cattle were to be used in the farming operation. The security agreement prohibited the sale of any of the secured cattle without the prior consent of the Ensmingers and entitled them to

immediate possession of the cattle upon default.

In the fall of 1980, Arnold sold a portion of the cattle and offspring to a third party. The Ensmingers financed the purchase and Arnold was given credit for the selling price. The balance of the note was not paid when due in January of 1981, but was renewed for another year. In February of 1981, the Ensmingers sold additional cattle and a truck and trailer to Arnold for $40,000, and took a promissory note for the purchase price and a security interest in the property. In December of 1981 the two notes were consolidated into a new one-year obligation for $56,499.11. The Arnolds, husband and wife, then executed a security agreement and financing statement, and listed as collateral the cattle, truck, trailer and "all other cattle now owned and hereafter acquired plus increase." The financing statement was duly recorded on January 8, 1982, in Pettis County, where the Arnolds lived and the cattle were to be kept.

The defendants Warsaw Auction Co. and the Central Missouri Sales Co. partnership were in the business of selling livestock on consignment for a fee. Between March 1, 1982, and May 23, 1983, Arnold sold $22,116.39 worth of cattle through the defendant Central Missouri Sales Co. Between January 26, 1982, and April 12, 1983, Arnold sold $3,359.20 worth of cattle through defendant Warsaw Auction Co. The defendants each received a commission fee for the service. Arnold was given a receipt from each auction house upon the delivery of the cattle for sale, which described him as seller of cattle, described the cattle to be sold and the charges to be assessed against the auction price. The net proceeds of the sales were issued to Arnold. The cattle were sold without the knowledge or consent of the Ensmingers. They received none of the proceeds. The defendant auction houses had no actual knowledge that the Ensmingers claimed a security interest in those cattle and made no investigation to determine if any security interest existed.

The promissory note for $56,499 became due in December of 1982, and no payments had been made. Arnold was given an extension of time, and the grants of extension continued through June of 1983. The Ensmingers brought an action in replevin against the Arnolds for the return of the secured cattle or money damages. Sometime thereafter, the Arnolds filed a petition in bankruptcy, and listed the Ensmingers as creditors. They then learned that the Arnolds did not have the secured cattle. Of the debt owed them by the Arnolds, $25,800 was non-dischargeable. The Ensmingers brought a criminal charge against Arnold for selling secured property. Arnold returned the secured truck to them, and they sold the vehicle for $2500. The trailer had been wrecked by Arnold and abandoned. After the criminal charge was brought, Arnold paid the Ensmingers $10,000 in cash.

The trial court denied the Ensminger claim for conversion. The conclusions of law that elaborated the judgment acknowledged the principle of *Farmers State Bank v. Stewart*, 454 S.W.2d 908, 915 (Mo. banc 1970), that

> [A]n agent, factor, commission merchant or auctioneer who receives property from his principal and sells it and pays the proceeds of the sale to him is guilty of conversion if the principal has no right to sell the property, even though the agent acts without the knowledge of the defect in title.

The court determined nevertheless that *Stewart* does not discuss or apply the Uniform Commercial Code to come to opinion, and so was irrelevant to the adjudication of the Ensminger claim. The court concluded that the Uniform Commercial Code governed the action, particularly as expounded in *United States v. Hext*, 444 F.2d 804 (5th Cir.1971) and as applied to selling agents.

The rationale of judgment rests upon a progression of legal premises that intermix the provisions of the Uniform Commercial Code and extra-Code tort principles. The rationale commences with the fact that the transfer by Arnold of the cattle to the auction houses for sale without consent of the Ensmingers constituted a default under the security agreement, and proceeds on

the proposition of law that under its terms the Ensmingers as secured parties had the right to take possession of the collateral. § 400.9–503, RSMo 1986. The Ensmingers accordingly had the legal right to possession of the cattle at the time of their removal *for sale* and the sale constituted a conversion. *Stewart*, 454 S.W.2d at 915[4]. The rationale also adopts the holding that an auctioneer, who without authority from the secured party sells the collateral delivered by a debtor and turns the proceeds over to the debtor, is liable to the secured party in conversion even though the auctioneer acted in good faith and without knowledge of the secured interest. *Id.*

The court concluded nevertheless that the Uniform Commercial Code so impinged as to foreclose any liability for conversion against the auction house marketing agent.

The court derived its judgment from the interplay of numerous provisions of Article 9. Section 400.9–109(3), RSMo 1986, defines *farm products* as "crops or livestock or supplies used in farming operations...." *Farm products* become *inventory* "if they are held by a person who holds them for sale or lease...." § 400.9–109(4), RSMo 1986. A buyer in ordinary course of business *other than a person buying farm products from a person engaged in farming operations* takes free of a security interest created by his seller.[1] § 400.9–307(1), RSMo 1986. *Farm products* transferred by a farmer to a marketing agency for sale—that is, to a person not engaged in farming operations—"cease to be 'farm products' [and] become inventory." § 400.9–109 Comment 4, RSMo 1986.

The court reasoned from these provisions and the facts found to a judgment of the non-liability of the defendant auction houses to the secured parties. It reasoned that Arnold was a farmer, "a debtor in possession, who bred livestock," goods that were *farm products* in his hands. § 400.9–109(3). The security agreement specified that the cattle—the collateral

goods—were to be used for farming, and so not meant to finance an inventory. As *farm products* in the hands of Arnold, notwithstanding a sale, a security interest continued in the collateral and identifiable proceeds received by the debtor. § 400.9–306(2). The security interest continued in the collateral even as against a buyer in ordinary course of *farm products* from a person engaged in farm operations. § 400.9–307(1). Arnold, however, delivered the cattle to the defendant commission merchants for sale. The auction houses were in the business of selling goods of that kind, and the cattle were sold in the regular course of that business. Thus [the progression to judgment concludes], the *farm products* in the hands of Arnold became *inventory* in the hands of the defendants, "taken by a buyer in ordinary course of business free of any security interest created by the seller."

This analysis validly explains the Code mechanism whereby an ordinary course buyer of agricultural goods, once *farm products* but then *inventory*, takes them free of any security interest. It does not, however, explain any comparable Code mechanism whereby an auctioneer who markets for a debtor agricultural goods that are subject to a security interest is exempted from liability to the creditor for conversion of those goods. Indeed, *Hext* —the authority that the defendant auction houses argue to relieve them of liability for conversion of the secured cattle and adopted by the trial court as the law of the case—acknowledges that the Code does not deal with the tort law of conversion. *Hext*, 444 F.2d at 811, n. 21. Nor does the Code deal with the conversion liability of commission agents. *First Nat'l Bank v. Southwestern Livestock, Inc.*, 859 F.2d 847, 849[1] (10th Cir.1988). It is a remedy, rather, as may be provided by other state law.

▮▮ Conversion is the wrongful exercise of dominion or ownership over a chat-

---

1. *"[b]uyer in the ordinary course of business"* means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind ... § 400.1–201(9), RSMo 1986.

tel. *Commercial Credit Corp. v. Joplin Auto. Auction Co.*, 430 S.W.2d 440, 443[3] (Mo.App.1968). The gist of the modern action, whatever the actual variety, is tortious interference with the right of possession. *St. Louis Fixture & Show Case Co. v. F.W. Woolworth Co.*, 232 Mo.App. 10, 88 S.W.2d 254, 263[8–11] (1935); Prosser & Keeton on The Law of Torts § 19, pp. 93–100 (5th ed. 1984). The most common manner in which the tort is committed is by the unauthorized transfer or disposal of possession of the chattel to one not entitled to its possession. *Id.* at 96. It is no answer that an act was in good faith or in honest belief that the transfer was lawful, or done by ignorant mistake. *Schulte v. Florian*, 370 S.W.2d 623, 625[2–6] (Mo.App. 1963). It is, as *Stewart* reaffirms, a common law tort of strict liability. Thus, an auction house that sells mortgaged goods under direction of its principal becomes liable as a converter notwithstanding that it acts without knowledge of the security interest. *Stewart*, 454 S.W.2d at 915.

This common law rule of the conversion liability of an auction house for the unauthorized transfer of goods to one not entitled to possession laid down in *Stewart*, contrary to argument, is rendered in the context of the Code provisions relating to secured transactions. It happens that one of the auction transactions in *Stewart* occurred before, and the other after, the Code became effective. Inasmuch as the security interest in both was perfected according to the law then in effect—as the opinion explains, at 915 n. 6—the holder of the perfected security interest had the same protection under the Code as under the prior law and the common law liability

of the auction house for conversion of the secured cattle remained the same.

It is as the defendant auction houses argue, that although *Stewart* does cite numerous provisions of Article 9 of the Code on the common law liability of a marketing agent for conversion, the implications of §§ 400.9–109(3) & (4), 400.9–307(1) and 400.-1–201(9) are slighted. The distinction between *farm products* and *inventory* that § 400.9–109(3) & (4) make—by which in one case a buyer in ordinary course does not take free of the security interest, and in the other case does—however, has no relevance to an auction house that is not a buyer. *Commercial Credit Corp. v. Joplin Auto. Auction Co.*, 430 S.W.2d 440, 442[1] (Mo.App.1968). Moreover, whatever the other effects of the Code on such transactions, the liability for conversion by an auction agency does not depend upon whether the security is *farm product* or *inventory* under the commercial law, but on the authority of its principal—here, the debtor Arnold—to sell the collateral.[2] And in that exercise, the auction house acts as the agent of the debtor and can stand in no better position than its principal. *Stewart*, 454 S.W.2d at 915. It is for this reason that, even though innocent, an auction agent who aids in the conversion by the sale of the secured goods is also liable. *Sanborn County Bank, Inc. v. Magness Livestock Exch.*, 410 N.W.2d 565, 567 (S.D. 1987).

■ The conclusions of law in support of the judgment correctly surmise that in the context of secured transactions the ground for conversion does not appear until the person who seeks to impose liability has the right to immediate possession of the

---

2. Indeed, merely to reclassify *farm products* as *inventory* does not extinguish a security interest in *farm products* sold by one engaged in farming operations. "When farm products pass into the hands of a nonfarmer, they lose their farm products classification and become inventory. Although section 9–307 protects a subsequent purchaser from a security interest created by a holder of inventory, it does not destroy a security interest that attached when the goods were farm products. [Section 9–307(1) affects only security interests created by the seller. Since the non-farmer did not create the security interest, the buyer will not be protected by this

section.] [Thus] ... [t]he packer who buys cattle from a broker could still be subject to the security interest created by the farmer who sold to the broker, even though the cattle were classified as inventory in the broker's hands." Sorelle, "Farm Products" Under the U.C.C.—Is a Special Classification Desirable?, 47 Tex.L.Rev. 209, 314 (1969); see also, *First Nat'l Bank in Lenox v. Lamoni Livestock Sales Co.*, 417 N.W.2d 443, 445 (Iowa 1987); *North Cent. Kan. Prod. Credit Ass'n. v. Washington Sales Co.*, 223 Kan. 689, 577 P.2d 35, 41 (1978); *Michigan Nat'l. Bank v. Michigan Livestock Exch.*, 432 Mich. 277, 439 N.W.2d 884, 893[3] (Mich.1989).

secured goods. The transfer of the cattle to the auction houses for sale without the consent of the secured creditors was, as the court found, a breach of the security agreement and by its terms put the debtor in default and entitled the creditors to immediate possession of the goods. The conduct of the auction houses thereafter to take charge of the cattle and sell them to third persons was a serious interference with that right of possession and constituted conversion. *Stewart*, 454 S.W.2d at 915 n. 4; Restatement (Second) of Torts § 222A (1965).

This rationale of *Stewart* is not without heed of the provisions of the Code, as the defendant auction houses argue to excuse its authority as a precedent. The opinion [454 S.W.2d at 916 n. 6] draws into its exposition not only the Code but also *Clovis Nat'l Bank v. Thomas*, 77 N.M. 554, 425 P.2d 726 (1967) to illustrate that, as to the question presented there as here, the Code did not change the rules of decision. The provisions of the Code the defendant auction houses say were slighted in *Stewart* are treated in *Clovis*, and with the same end. *Clovis* [425 P.2d at 731[4–6]] explains that the express provision that a buyer in ordinary course of business of farm products from a person engaged in farming operations does not take free of a security interest created by the seller confirms that the scheme of the Code is " 'to freeze the agricultural mortgagee into the special status he has achieved under the pre-code law.' " The opinion deemed it only logical, then, that if a buyer from one engaged in farming takes subject to the security interest, "the selling agent is subject to the rights of the secured party in the collateral." The opinion draws to the conclusion: "Thus, the holder of the security interest in farm products has the same protection under the code which he had under the pre-code law, and the cattle broker is still liable to the secured party for conversion of the collateral."

That is precisely the sense of *Stewart*. That is precisely the sense drawn from *Stewart* in *United States v. Gallatin Livestock Auction*, 589 F.2d 353 (8th Cir.1978). The authority of the Missouri Supreme Court en banc in *Stewart* governs the decision in the trial court and in this court. The resort to *Hext* for the trial judgment was inadvised not only because that decision lacks authority, but also because it is unsound.

*Hext* was an exercise of federal jurisdiction by a federal court under a federal enactment of a suit brought by the United States for conversion of bales of cotton in which it held a security interest. The Farmers Home Administration agency of the Department of Agriculture made a loan to Hext to finance his cotton farming operations. Hext secured the loan by a chattel mortgage, duly recorded, on the forthcoming crop. Hext was also in the business of cotton ginning, and after harvest of the cotton crop, ginned and marketed the cotton through his own company. The ginned cotton was stored with a bailee warehouse, the Harlingen Company, and marketed though Marshall & Marshall, as selling agent. The receipts from the sales of his cotton were placed in the Gin Company account. At the end of the season Hext was unable to pay the loan. Hext and the Gin Company were insolvent, and the United States sued Marshall as the selling agent. The selling agent Marshall had no actual knowledge of the FHA security interest.

*Hext* relates to a legal issue common to the agricultural practice whereby the farmer or stock-breeder disposes of the farm product through a marketing agent: the liability of the agent to a secured creditor whose secured goods have passed through its hands. Since the Code does not displace the tort law, and the Code does not otherwise provide for the liability of third persons to the secured creditor, the liability of the auctioneer to the secured creditor for the sale of the collateral is governed by non-Code law. 1 R. Anderson, Uniform Commercial Code § 1–103:25 (3d ed. 1981); *Hext*, 444 F.2d at 810 n. 21. In suits brought by the United States under congressional grants of jurisdiction that do not preempt state law—as in *Hext* and *Gallatin*—the federal circuits often disagree as to whether the state or federal law shall

determine the rights and liabilities of the parties. The rule of law that *Hext* applies to determine the liability to a secured creditor of a marketing agent who sells the collateral without consent is a rule of *federal* law, and not of the state. It is a choice of law with which other federal circuits disagree. See, e.g., *United States v. Gallatin Livestock Auction*, 448 F.Supp. 616 (W.D.Mo.1978). *aff'd per curiam*, 589 F.2d 353 (8th Cir.1978); *First Nat'l Bank of Amarillo v. Southwestern Livestock, Inc.*, 859 F.2d 847 (10th Cir.1988); *United States v. Union Livestock Sales Co.*, 298 F.2d 755 (4th Cir.1962).

In fashioning a uniform "federal common law" applicable to such a dispute, *Hext* [444 F.2d at 809[2]] looked to Article 9 and other relevant provisions of the Code as well as the "general common law" of conversion. We need not retrace the path of the opinion through the Code that found an equivalence between the defendant selling agent and the purchasers of the cotton as buyers in ordinary course from a person not engaged in farming operations, and hence not subject to the security interest of the FHA. The decision of liability in conversion or not of the selling agent came to rest on § 233(1) of the Restatement (Second) of Torts (1965) adopted by the court as the federal rule of conversion applicable to the case:

> [O]ne who as an agent or servant of a third person disposes of a chattel *to one not entitled to its immediate possession* in consummation of a transaction negotiated by the agent or servant, is subject to liability for a conversion to another who, as against his principal or master, is entitled to the immediate possession of the chattel. 444 F.2d at 809[2] (Emphasis in original.)

The opinion concluded that since the cotton in the hands of the selling agent was inventory, the purchase was not from a person engaged in farming operations, and the buyer took free of the creditor's security interest under § 9–307(1) of the Code. Thus [at 816], to the extent the selling agent acted in good faith and without actual knowledge of FHA's security interest, they could not be liable as converters since the cotton was not transferred "to one not entitled to its possessions."

Whatever the premises of the "federal common law" theory of conversion *Hext* adopted to relieve from liability for conversion a marketing agent who sells secured goods without consent of the creditor innocent of that interest, the law of Missouri imposes liability, despite the good faith or lack of knowledge of the agent. *Stewart*, 454 S.W.2d at 915. That is because the agent stands in the stead of the principal, and here the principal Arnold was without the right to immediate possession of the cattle or the consent of the owner to transfer them for sale. See *First Nat'l Bank of Amarillo v. Southwestern Livestock, Inc.*, 859 F.2d at 850[2]; *United States v. Gallatin Livestock Auction*, 448 F.Supp. at 621, *aff'd per curiam*, 589 F.2d 353; *Michigan Nat'l Bank v. Michigan Livestock Exch.*, 432 Mich. 277, 439 N.W.2d 884, 893[3] (1989). These decisions, as does *Stewart*, reject the reasoning and authority of *Hext* and, as does *Stewart*, hold the agent strictly to the authority of the principal.

These decisions, as do we, also reject the analysis that *Hext* applies to Restatement (Second) of Torts § 223(1) as forced and the logic as nonsequential. *Hext* [444 F.2d at 815] determined that since the buyers of the inventory cotton took free of the FHA security interest, they were entitled to immediate possession, therefore the marketing agent that facilitated the sales did not dispose the chattels *to one not entitled to its immediate possession*, and could not be liable for conversion under that Restatement rule. In neither *Hext* nor here were the buyers from the marketing agent entitled to immediate possession as against the secured creditor until *after* the purchases that the agent facilitated. The transfer for sale to the defendant auction houses of the secured cattle by the debtors Arnold without the consent of the creditors Ensminger constituted a default under the terms of the security agreement and entitled the creditors to immediate possession of the chattels. Thus, when the collateral came into their hands for that purpose, the immediate right to possession was in the cred-

itors and no one else. "Except as otherwise provided ... a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors." § 400.9–201. The marketing agents for the debtors stood in the shoes of the debtors. The debtors were not authorized to sell the cattle, so neither were the defendant auction houses. In the context of agent liability for conversion, Restatement (Second) of Torts § 233(1) means that there is no liability if the transferee had a preexisting superior right to possession of the property. The buyers of the cattle from the auction houses had no such *preexisting* right to possession as against the secured party. The defendant auction houses were liable to the secured creditors Ensminger for the conversion of their cattle. *First Nat'l Bank v. Southwestern Livestock, Inc.*, 859 F.2d at 850; *Michigan Nat'l Bank v. Michigan Livestock Exch.*, 439 N.W.2d at 895; *Sanborn County Bank v. Magness Livestock Exch.*, 410 N.W.2d at 567.

The defendants argue the effect of *United States v. Progressive Farmers Mktg. Agency*, 788 F.2d 1327 (8th Cir.1986) and other decisions from that federal circuit and other courts to support the judgment of nonliability of the defendant auction houses for conversion entered by the trial court. *Progressive*, as did *Hext*, dealt with a claim by the FHA as creditor against a marketing agent for the conversion of the secured goods. *Progressive*, however, unlike *Hext*, applied the state law and not the "federal common law", to come to decision. *Progressive* understood the law of Iowa—including a statute enacted after the sale by the marketing agent—to express the public policy that commission merchants who sell in the ordinary course of business are not subject to a security interest created by the seller. On that basis, the court denied the claim for conversion. *Progressive* was quickly repudiated by the Supreme Court of Iowa in *First National Bank in Lenox v. Lamoni Livestock Sale*, 417 N.W.2d 443 (Iowa 1987). The state court concluded, rather, that the public policy *Progressive* ascribed to Iowa was embodied in a statute enacted after the sale of

the goods, and the sale by the selling agent without the consent of the secured creditor amounted to a conversion under the law that governed the transaction. An amalgam of Code and tort state law, comparable to our own, formed the Iowa court rationale to find the basis for conversion liability against the marketing agent.

The defendants argue also for the support of the judgment on the theory that they were bailees under § 400.7–404. That section provides that a bailee who in good faith and in observance of reasonable commercial standards has received goods and disposed of them according to the terms of a document of title is not liable, even if the person from whom the goods were received had no authority to dispose of them. They argue the effect of *Michigan Nat'l Bank of Detroit v. Michigan Livestock Exch.*, 165 Mich.App. 243, 418 N.W.2d 663 (1987). In that case, the defendant livestock exchange auctioned off cattle in which the plaintiff bank had a security interest, and the bank sued for conversion. The defendant exchange claimed as a bailee and, as such, immunity from suit under § 400.7–404. The court held that the trucker's receipt under which the exchange held the livestock in which the bank held a security interest qualified as a *document of title* under another Code section, so that the exchange held as a bailee of the goods and was subject liability under § 400.7–404.

This section, of course, was not the theory of the evidence nor of the trial court judgment. More decisively, however, that opinion of the Michigan Court of Appeals was overturned by the Supreme Court of Michigan in *Michigan Nat'l Bank v. Mich. Livestock Exch.*, 432 Mich. 277, 439 N.W.2d 884 (1989). The court held, simply, that an auction house is not a bailee under the Code, and that neither § 400.7–404 nor any other provision of the Code protects an auction house from liability under the facts of the case.

The defendants cite numerous other decisions, such as *First Bank of North Dakota v. Pillsbury Co.*, 801 F.2d 1036 (8th Cir. 1986) and *United States v. Continental Grain Co.*, 691 F.Supp. 1193 (W.D.Wisc.

1988), to avoid liability and sustain the judgment. These cases involved action for conversion against a buyer in ordinary course of goods that were inventory and so not subject to the security interest of the creditor. The judgment we review relates not to the liability of a buyer of inventory—who takes free of any security interest under § 400.9–109(4) and § 400.1–201(9)—but to the liability of an agent who stands in the stead of a principal without right to possession of the secured chattel or authority to sell it.

The defendant auction houses argue nevertheless that the constructive notice of the secured interest of the creditors in the goods transferred to them for sale, upon which their liability is made to rest, irreconcilably conflicts with federal law and so is preempted and unenforceable under the supremacy clause of the United States Constitution. The holding in *Stewart*, they argue, requires that livestock marketing agents either search for recorded security interests in the goods being sold, or bear the risk of money liability based solely on constructive notice should the sale violate a recorded security interest. They point to the requirement of the federal Packers and Stockyards Act that a market agent deliver the full proceeds of sale to the livestock seller by the close of the next business day following the sale. 7 U.S.C. § 228b (1980). A delay in payment of the sales proceeds constitutes an unfair practice under the Act and incurs a penalty. 7 U.S.C. § 228b(c). In order to avoid liability under *Stewart*, however, a market agent would have to determine as to each customer the existence of a lien filing in the office of the appropriate county recorder or from the secretary of state. The requirements of state law, the argument concludes, make it impossible for the market agent to comply with both the federal prompt payment condition and also protect itself from liability under state law premised on constructive notice. Thus, the rule in *Stewart* engenders a direct conflict with the federal law and impedes the policy for prompt payment. In such a case, the argument concludes, the supremacy clause operates to accomplish and execute the federal con-

gressional purpose by preemption of the state law. See *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

The point the defendants pose was addressed in *Stewart*, but in terms of public policy, and not preemption. *Stewart* [454 S.W.2d at 911[2]] rejected the contention that under the Packers and Stockyards Act the market agent was not subject to liability to the secured creditor for the sale of the collateral in the absence of actual knowledge of the existence of the secured interest. To the argument that in light of the federal Act the continued application of the Missouri law of conversion would be to place "an impossible burden" on the conduct of a sales barn operator business, the court responded [at 917[7, 8]] that the burden was readily relieved by the purchase of liability insurance to cover the risk of loss from conversions. It was an expense of operation, moreover, reasonably contemplated by the Act. This ready means open to a market agent to protect against sellers who conceal the true interests in the property delivered for auction relieves the risk of personal liability where it is impractical to search the records, and relieves also against any irreconcilable conflict between the state and federal law.

The concern the defendant auction houses pose, however, has not been negligible. The rule in *Stewart* and in those many states that have used its effect not only tends to impair the convenience of commercial transactions, but also transforms the market agent into a guarantor of the debts of the farmer. Uchtmann, Bauer & Dudek, The UCC Farm Products Exception—A Time To Change, 69 Minn.L.Rev. 1315, 1319 (1985). Those are the consequences that *Hext* undertook to avoid by the application of a derived "federal common law" to farm products transactions under the Code. Those are the consequences that many states have undertaken to meliorate by amendment of the farm products exception in their commercial codes to reflect the reality of modern agricultural and marketing practices. *Id.* at 1316. Some states now exempt market agents and auction

houses from liability for selling farm products subject to a security interest. Missouri is not among them. *Id.* at 1330.

Congress has since the enactment of the Food Security Act of 1985, 7 U.S.C. § 1631 (1988), preempted the farm products exception of the Code. The legislation was prompted not only to bring regularity to the confusion in state law brought about by the mass modifications of the farm products exemption of the Code and the diverse treatment of that section by the states, but also to relieve the burden on interstate commerce imposed by state laws "that subject the purchaser of farm product to double payment for the products." 7 U.S.C. § 1631(b); C. Wolfe, Section 1324 of the Food Security Act of 1985: Congress Preempts the "Farm Products Exception" of Section 9–307(1) of the Uniform Commercial Code, 55 UMKC L.Rev. 454, 455 (1987). In general terms, the Act provides that "notwithstanding any other provision of Federal, state or local law," a person who in ordinary course buys a farm product from a seller engaged in farming operations takes free of a security interest created by the seller, even though the security interest is perfected and the buyer knows of its existence. § 1631(d). Thus, the Act directly and deliberately preempts § 400.9–307(1). The Act also protects commission merchants and selling agents who sell farm products in ordinary course of business, and so effectively abrogates the rule of strict liability for conversion that *Stewart* reaffirms and we are bound to follow.

The defendant auction houses contend also that a judgment against them in favor of the plaintiffs for the conversion of their cattle is foreclosed in any event by payment to the Ensmingers by Arnold of $10,000 in satisfaction and release of any debt owed them by the Arnolds or the auction houses for the sale of the secured cattle.

After the debt on the promissory note owed by the Arnolds to the Ensmingers became due, the Arnolds filed a petition in bankruptcy and listed the Ensmingers as creditors. The bankruptcy court determined that $25,800 of the debt was nondischargeable. The creditors brought criminal charges against the debtor Lawrence Arnold for selling secured property. After the charges were brought, Arnold paid the Ensmingers $10,000 in cash. The evidence is in dispute as to why the money was paid and why it was received. Ensminger testified that he accepted the payment to "[k]eep from sending him to the penitentiary [because] he sold mortgaged property." It was a "deal" negotiated with Arnold for the Ensmingers by their attorney. The payment was not to "wipe out anything" Arnold owed them. It was not to be deducted, Ensminger said, from "what the bankruptcy court said was non-dischargeable." The prosecutor "had set him up ... for six years, and he didn't want to go, so he wanted to negotiate a deal to keep from going to the pen." In exchange for the $10,000 Ensminger "[d]ropped the charges of sending him to the penitentiary." He did not intend thereby to release Arnold from further liability. They signed "a receipt or something", Ensminger said, but not a written agreement.

Arnold testified that the money paid, rather, "wasn't to keep me out of the penitentiary, but it was to wipe the slate clean, was what the bankruptcy court said I should pay him." The payment of $10,000, he reaffirmed, was because Arnold "still owed him a debt on cattle"—and the agreement for the payment of the money was to "[w]ipe out what I owed, what the bankruptcy court allowed Mr. Ensminger, wipe that off." The scope of the transaction, as led by the questions of counsel, was expanded from the accommodation of the existing personal indebtedness to a release of the auction houses from liability. The payment came to encompass not only "what I owed Ensminger that the bankruptcy court gave him down there", but also "any sales barns or anything else." His "understanding," from what his counsel advised, was that the $10,000 was also "to wipe out ... the liability that Mr. Fowler, Mr. Burton and Warsaw Auction Company, the liability these sale barns might have had." The writing given to Arnold for the payment of the $10,000, he said, was lost in fire.

The defendant auction houses argue that the effect of this evidence was an agreement of an accord and satisfaction of any subsisting liability from the Arnolds or the auction houses to the Ensmingers from the sale of the cattle. They argue, alternatively and at the least, that the $10,000 payment by Arnold be credited against any recovery by the Ensmingers "as a payment made by a joint tortfeasor."

The judgment for the defendant auction houses entered by the trial court rests on the provisions of the Code, and hence the effect of the payment of the $10,000 as an accord or satisfaction or compromise and release of the claim against the auction houses for conversion was not reached, and the dispute of that evidence not resolved.

■ The evidence was not sufficiently probative to derive the inference that either the plaintiffs or the defendants claim for it. The consideration that the Ensmingers contend the $10,000 payment to them represents is contrary to public policy. A contract made with the purpose and upon the consideration that a criminal prosecution shall be suppressed, stifled or stayed, will not be enforced. *McCoy v. Green*, 83 Mo. 626, 632 (1884); *Fidelity & Deposit Co. v. Grand Nat'l Bank of St. Louis*, 69 F.2d 177, 180[5, 6] (8th Cir.1934); Restatement (Second) of Contracts § 178 (1979). The law nevertheless assumes as fact that business is conducted not only in good faith, but also without wrongdoing. *Pulliam v. Bond*, 406 S.W.2d 635, 643[13–15] (Mo. 1966). Accordingly, "where the act of a party may be referred indifferently to one of two motives, the law prefers to refer it to that which is honest, rather than to that which is dishonest." *Fidelity & Deposit Co. of Maryland v. Grand Nat'l Bank of St. Louis*, 69 F.2d at 183[17–20]; A. Corbin, Corbin on Contracts § 1521 (1962). The honest motive for the payment by Arnold and the acceptance by Ensminger of the $10,000 was to discharge, *pro tanto*, the personal liability to the Ensmingers that remained undischarged in the bankruptcy. That was the only legitimate effect that the trier of fact could attribute to that transaction.

The theory of the evidence that the defendant auction houses argue—that the $10,000 transaction was intended as an accord and satisfaction or release of all claims by the Ensmingers against not only the Arnolds, but also as a release of the auction houses from liability—simply was not open to the trier of fact. The writing that reified the transaction was not before the court, and the parole evidence was too vague as proof of either.

■ Accord and satisfaction and release are affirmative defenses and the risk of nonpersuasion rests upon the defendant to prove the terms of agreement as well as its execution. *Jenkins v. Simmons*, 472 S.W.2d 417, 420[1, 2] (Mo.1971). Accord and satisfaction, as well as release, are matters of agreement and so are governed by contract principles. As with other contracts, the intention of the parties governs the effect of its terms. *State ex rel. Normandy Orthopedics v. Crandall*, 581 S.W.2d 829, 833[43] (Mo. banc 1979).

■ Either a bona fide dispute or an unliquidated claim will support an accord and satisfaction. *Edgewater Health Care v. Health Sys.*, 752 S.W.2d 860, 868[14–17] (Mo.App.1988). A claim that is neither unliquidated nor in dispute, therefore, requires other consideration to support an accord and satisfaction. *Majestic Bldg. Material v. Gateway Plumbing*, 694 S.W.2d 762, 764[2–4] (Mo.App.1985). The payment by Arnold to the Ensmingers of $10,000 was not a sufficient consideration for an accord and satisfaction of the adjudicated pre-existent debt of $25,800. *Shapiro v. Shapiro*, 701 S.W.2d 205, 206[4, 5] (Mo.App.1985).

■ Nor was the evidence otherwise sufficient to raise an issue of release of the liability of the auction houses. In the absence of a requirement of statute, a release need not be in writing. 76 C.J.S. *Release* § 6 (1952). A release even in writing, however, must show a manifest intention to release by language clear, precise and unequivocal. *Jenkins v. Simmons*, 472 S.W.2d at 420[3]. The parole rendition of the terms of the written agreement of the Ensmingers for which Arnold gave $10,000

was vague, indefinite and inconclusive. It does not describe the cause of action to be released or if it is in full of all damages, or other scope. It renders only the legal opinion of counsel as to its effect and consequences. The account of that evidence, anomalously, releases only the auction houses from tort liability, and not the Arnolds, although they alone supplied the money. The proof was insufficient to raise the affirmative defense issue of release. See, e.g., *Booker v. Kansas City Gas Co.*, 231 Mo.App. 214, 96 S.W.2d 919, 923[2, 3] (1936) and *State ex rel. Normandy Orthopedics v. Crandall*, 581 S.W.2d 829, 831, n. 1.[3]

■■■■■■ Whatever the true nature of the money transaction, it remains that the Ensmingers received from the Arnolds, and retain, the $10,000. It would be an unjust enrichment to them unless the Arnolds derived some lawful benefit from that performance. That benefit, we determine, was a reduction *pro tanto* of any personal liability by Arnold to the Ensmingers that remained undischarged in the bankruptcy. That liability was for the value of the secured cattle sold at the auctions, adjudicated by the bankruptcy court at $25,800. The unlawful sale of those cattle by the auction houses is also the subject of the action for conversion by the Ensmingers against the auction houses. It is an action for which the Ensmingers are entitled to judgment. An injured party, however, may have only one satisfaction for that invasion of right. *Abbott v. City of Senath*, 243 S.W. 641, 642[2] (Mo.1922). The liability of the auction houses for conversion is for an innocent interference with the right of the Ensmingers to possession of the secured chattels. They acted in ordinary course of business and without actual knowledge of that interest. Our law nevertheless deemed them agents of Arnold who acted with knowledge, and so stand in the shoes of their principal and are guilty of conversion, even though they acted innocently. *Stewart*, 454 S.W.2d at 915; Restatement (Second) of Agency § 349 (1958). In such cases, our law imposes the conversion as a rule of strict liability, and although principal and agent are each liable to the owner, there can be but one satisfaction. *Wirt v. Schuman*, 67 Mo.App. 163, 171 (1896). It would be an unjust enrichment for the Ensmingers to retain the full proceeds of a judgment for conversion of the cattle and the $10,000 already paid in partial satisfaction for the value of the cattle also. The auction houses are entitled to a setoff of the partial satisfaction already made. *Abbott v. City of Senath*, 243 S.W. at 642[2].

The defendant auction houses argue, finally, that in any event the Ensmingers should be denied recovery to the extent that they failed to avoid the consequences of their borrowers' wrong because they were in a superior position to do so. They cite *Southern Missouri Bank v. Fogle*, 738 S.W.2d 153 (Mo.App.1987). *Fogle* restates the basic damages principles that govern conversion actions: The proper measure of damages in such a case is the reasonable market value of the property at the time of conversion. Also, interest is allowed on the value of the property from the date of its conversion. In *Fogle* there was also a claim for damages in the form of lost profits. It was in the context of that proof that the court noted [at 158[10–13]] that since a claimant is required to minimize damages, consequential damages in a conversion case are limited "to the period it would take a reasonable person to replace the converted items." The Ensmingers make no claim for loss of use or of profits from the deprivation of the property. The doctrine of

---

**3.** The record on appeal and briefing are otherwise inadequate for a definitive response to the legal issue of release that the affirmative defense undertakes to pose. There is no evidence as to the date of the $10,000 transaction except that it was "after 1983." The judgment of the bankruptcy court, although before the trial court was not presented to this court, so that even that date used by the witnesses as a reference on that issue is lacking. Section 537.060, which governs the subject of release and contribution between tortfeasors, was drastically rewritten with effect on September 28, 1983. The legal implications of the evidence, even if otherwise probative of release, depend upon whether the agreement to release was executed before or after the effective date of amended § 537.060. *Aherron v. St. John's Mercy Medical Center*, 713 S.W.2d 498, 502[4] (Mo. banc 1986). The auction houses do not address those implications, and so leave both the evidence and the law too uncertain for judicial decision on the issue of release.

avoidable consequences has no application to this case.

The defendants Warsaw Auction Co. and the Central Missouri Sales Company partnership were separate actors as to separate secured property. The unauthorized sale by the Warsaw auction house between January of 1982 and April of 1983 of cattle secured to the Ensmingers was a serious interference inconsistent with their right of possession and constituted a conversion of that property. The unauthorized sale by the Central Missouri auction house between March of 1982 and May of 1983 of other cattle secured to the Ensmingers was also a conversion of that property. Accordingly, the Ensmingers are entitled to a separate judgment against each of the auction houses for the separate acts of conversion by each.

The market value of the converted cattle has yet to be adjudicated. That proof was made though the tabulation of the separate sales receipts of the defendants Central Missouri Sales partnership and the Warsaw Auction Company. There was a dispute as to at least one sales receipt of the Warsaw Auction Company, which included two hogs among the transactions. However, only cattle were the subject of the sales and security agreements between the Ensmingers and the Arnolds. Thus, as to the defendant Warsaw Auction Company, a true determination of reasonable market value of the converted cattle, and hence damages, remains.

The judgment is reversed and the cause is remanded to the trial court to determine the reasonable market value of the cattle converted by each auction house. The court is directed thereupon to enter judgment for the plaintiffs against each separate auction house in the amount determined against each defendant, less *pro tanto* the partial satisfaction of $10,000, plus legal interest on each judgment from the date of that conversion.

All concur.