**FIRST NATIONAL BANK OF STEELE-VILLE, N.A., Plaintiff–Respondent/Cross–Appellant,**

v.

**ERB EQUIPMENT COMPANY, INC., Defendant–Appellant/Cross–Respondent.**

No. 68042.

Missouri Court of Appeals,
Eastern District,
Division Three.

March 5, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 24, 1996.

Application to Transfer Denied
May 28, 1996.

Paul M. Brown, Bruce D. Ryder, Neal C. Stout, Coburn & Croft, St. Louis, for appellant.

Craig A. Smith, Robert J. Selsor, Nicole M. Chaput, Suelthaus & Walsh, P.C., St. Louis, for respondent.

SMITH, Presiding Judge.

Plaintiff, First National Bank of Steeleville, brought this action to recover the proceeds of sales of John Deere machinery by defendant, Erb Equipment Company. Erb had repossessed the machinery from AmEarth Corporation, a debtor of both plaintiff and defendant. Defendant, by counterclaim, sought a declaration that it held purchase money lienor status as to the machinery seized and was entitled to equitable subrogation. The court entered a Summary Judgment in plaintiff's favor for $437,500, denied defendant's affirmative defenses and counterclaim, and granted defendant's motion for summary judgment on plaintiff's claim for prejudgment interest and punitive damages.

Both parties appeal. We affirm in part and reverse in part.

The plaintiff bank has its principal place of business in Steeleville, Illinois. Defendant is a Missouri corporation with its principal place of business in Fenton, Missouri. It is engaged in the business of selling, leasing, and servicing John Deere industrial machinery. AmEarth Corporation is an Illinois corporation engaged in the business of mining and excavation. In the late 1970's and early 1980's the Bank loaned operating funds to Jones Excavating Company and its principal, Harry Jones. The Bank acquired blanket security interests in excavating machinery as security for those loans. In May 1985, the Bank loaned funds to Avery Wheatley, which were also secured by excavating machinery. On March 26, 1985, Jones and Wheatley incorporated AmEarth. The Bank loaned $71,000 to AmEarth which was personally guaranteed by Jones and Wheatley.

In 1987, AmEarth decided to purchase excavating machinery from Jones and Wheatley. In July, the Bank loaned AmEarth $450,000 on a promissory note secured by a blanket security agreement. The agreement gave the Bank an interest in all of AmEarth's equipment of every kind and description, "whether now or hereafter owned, existing, or acquired". The agreement stated that it was to be governed by the Illinois Uniform Commercial Code. The Bank had filed a financing statement with the Illinois Secretary of State on December 11, 1985, thereby perfecting its interest. After execution of the security agreement the Bank extended further loans to AmEarth, $157,259 on August 1, 1987, and $50,000 on April 5, 1988. By August 1987, the Bank had filed financing statements with both the Missouri Secretary of State and the Vernon County, Missouri, recorder of deeds. AmEarth was conducting mining operations in Vernon County.

On July 10, 1987, AmEarth purchased from defendant a used John Deere 644C Wheel Loader for $82,500, $22,500 of which was covered by a trade-in of other machinery. AmEarth also bought a John Deere 850B Dozer for $122,882, $32,000 of which

was covered by trade-in. Although the machinery traded in was covered by the Bank's blanket security agreement, it did not assert its interest because it hoped the new equipment would help AmEarth succeed or at least increase the value of the mining operation if it had to be sold.

To cover the balance due to defendant, AmEarth executed a security agreement on July 10, 1987, giving Erb an interest in the two pieces of machinery. The agreement provided that Erb would assign the note and security to the Associates Commercial Corporation, with that corporation having a right of recourse against Erb. On August 17, 1987, AmEarth began leasing an 862 Prime Mover, an 844 Wheel Loader, and a 792 Excavator from Erb.

In 1988, AmEarth began experiencing financial problems. The company closed its Randolph County, Illinois office and relocated its principal place of business to Vernon County, Missouri. Because AmEarth had fallen in arrears in its payments to Associates that company exercised its right of recourse against Erb which paid the July 10, 1987 note's unpaid balance to Associates. Associates, without Erb's knowledge marked the agreement "paid" and forwarded it to AmEarth.

In December 1988, AmEarth and Erb began negotiations to convert AmEarth's leases of John Deere equipment into purchases and to refinance past-due non-purchase money charges that AmEarth owed Erb. The "global" financing plan was executed by Erb and AmEarth and dated December 27, 1988. Erb contends that the document was actually executed in mid-January 1989 and that it filed its financing statement on February 2, 1989. The date of execution is of no importance on this appeal.

The agreement refinanced the balance due to Erb for its payment to Associates on AmEarth's 1987 purchase of John Deere equipment. It also provided that AmEarth would purchase the Prime Mover, Wheel Loader, and Excavator for $218,645, $87,000, and $163,000 respectively. As a trade-in Erb received from AmEarth two pieces of machinery with a value of $215,000 and $15,000 rental credit on the Excavator.

The agreement consolidated (1) the purchase money debt for the three pieces of machinery which had been converted from lease to purchase, (2) the outstanding debt of $304,303.52 on the note which Associates assigned to Erb under its right of recourse (covering the Crawler Loader and Wheel Loader purchased from Erb in 1987) and (3) additional obligations which AmEarth owed to Erb in the amount of $77,947.25. The agreement provided that it was to be governed by Illinois law. The effect of the agreement was to bring together in one security document debt which was clearly purchase money debt (1), debt which was clearly not purchase money debt (3), and debt about which the parties are in disagreement as to its purchase money status (2).

AmEarth made one payment of $6230.27 on the Erb agreement and in 1989 ceased mining operations. On June 29, 1989 Erb repossessed AmEarth's machinery and the next day the Bank sent written demand that Erb return the machinery to AmEarth. Although the Bank's loans to AmEarth were in default and it claimed a security interest in the machinery senior and superior to Erb's interest it took no action to foreclose on AmEarth's machinery prior to Erb's sale of the collateral securing Erb's agreement with AmEarth. The Bank further made no demand on Erb to turn the machinery over to the Bank. Its only request was that the machinery be returned to AmEarth. Two days before the public sale by Erb of four pieces of the machinery the Bank wrote Erb that "all proceeds from the auction should be paid to First National Bank".

Erb conducted a private sale of the Wheel Loader which it bought for $57,500. The other four pieces of machinery were sold at a public auction to Erb on September 7, 1989. The total public sale proceeds from the machinery was $371,500, which along with the private sale proceeds, were applied against AmEarth's debt leaving an unpaid debt from AmEarth to Erb of $200,000.

In October 1989, the Bank brought suit against Erb to recover the proceeds of the two sales of John Deere machinery. Erb filed a counterclaim alleging tortious interfer-

ence with Erb's rights of contract with Am-Earth and raising a claim for equitable subrogation to the rights of Associates. The trial court entered its findings of fact and conclusions of law granting Bank's motion for summary judgment and denying Erb's motion for summary judgment on its counterclaim. The court found that by the December 27 agreement Erb had transformed and extinguished any purchase money security status in the five items of AmEarth machinery. It further found that Illinois law applied as to the Bank's rights to the sales proceeds and found Erb to have become a purchaser rather than a secured creditor when it purchased the machinery for itself at the foreclosure sales. Therefore, because Erb took the machinery subject to the bank's prior security interest the court found Erb to be liable for conversion due to its retaining the machinery after the sales. The court granted Erb's motion for summary judgment on Bank's claim for prejudgment interest and punitive damages. Both parties appeal.

The key issue which must be resolved is which party had the superior lien as to the five items of machinery. That issue is determined in turn by whether Erb had a purchase-money lien on all or some of the items of machinery and that status is determined by the legal effect of the December 27 agreement between Erb and AmEarth.

The Uniform Commercial Code (UCC), which has been adopted in this state, provides the rules to be applied in determining the priority of conflicting security interests. The primary rule is that "Conflicting security interests rank according to priority in time of filing or perfection." § 400.9–312(5)(a).[1] The Bank's blanket security instrument was prior in time of filing and perfection to Erb's December 27 agreement and if the first in time rule applies the Bank's lien is superior. There is an exception created for purchase money security interests. That exception is set out in § 400.9–312(1) through (4) depending on the nature of the item involved. The machinery involved here was operating equipment, not inventory. Therefore it is covered by § 400.9–312(4). § 400.9–107 con-

tains the definition of purchase money security interest:

**Definition—"purchase money security interest".**—A security interest is a **"purchase money security interest"** *to the extent* that it is

(a) taken or retained by the seller of the collateral to secure all or part of its price; or

(b) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used. (Bold in original, underlining added).

■ The "to the extent" language has created problems for the courts in other jurisdictions. The effect of that language has not been addressed in this jurisdiction. The problem develops in at least two circumstances. The first is where refinancing occurs with a new security agreement to cover a pre-existing purchase money debt. The second is where a single security instrument covers debt, a portion of which arose as purchase money debt and a portion of which arose as non-purchase money debt. We are confronted with the latter and nothing contained herein is intended to express a position on refinancing. Two basic lines of authority have emerged referred to as the "transformation rule" and the "dual status rule". Under the transformation rule unless the security covers only debt incurred in purchasing the collateral it is not a purchase money security. Any refinancing of the original purchase money debt or combining it with other debt transforms the debt to non-purchase money status.

Some courts which utilize the transformation rule hold basically that in order to be considered a purchase money security interest the collateral must secure its purchase price and nothing else. *In re Simpson,* 4 UCC Rep.Serv. 243, 1966 WL 8812 (W.D.Mich.1966); *In re Manuel,* 507 F.2d 990 (5 Cir.1975)[3,4]; *In re Norrell,* 426 F.Supp. 435 (M.D.Ga.1977)[1]. Other courts have interpreted the refinancing as a novation, i.e., a new non-purchase-money loan is

---

1. All statutory citations are to RSMo 1994.

taken, and the prior purchase money debt is extinguished. *Matthews v. Transamerica Financial Servs.*, 724 F.2d 798 (9 Cir.1984); *In re Snipes*, 86 B.R. 1006 (Bankr.W.D.Mo. 1988); *In re Faughn*, 69 B.R. 18 (Bankr. E.D.Mo.1986); *Dominion Bank of Cumberlands, N.A. v. Nuckolls*, 780 F.2d 408 (4th Cir.1985)[6]; *In re Jones*, 5 B.R. 655 (Bankr. M.D.N.C.1980)[1]. Because the proceeds of the new loan are not used to acquire rights in the collateral, but rather to pay off the former loan, the new loan is not by definition purchase money. Courts that employ this second rationale find their support in comment 2 to § 9–107 of the UCC, which prohibits including "antecedent debts" in the category of purchase money interests. The cases which have adopted the transformation rule do not discuss the "to the extent" language.

■ The dual status rule allows the security to be divided into that portion which encompasses purchase money debt and a different portion which represents non-purchase money debt. Priority in the purchase money portion of the security is given with the remainder of the security interest being subject to the time priority restrictions. The courts which have adopted the dual purpose rule premise their decisions largely on the "to the extent" language of § 400.9–107 as evidencing that a single security may encompass both purchase money security and non-purchase money security. *In re Pristas*, 742 F.2d 797 (3 Cir.1984)[3]; *In re Conn*, 16 B.R. 454 (Bankr.W.D.Ky.1982); *In re Stevens*, 24 B.R. 536 (Bankr.D.Colo.1982)[4]; *John Deere Co. v. Production Credit Ass'n. of Murfreesboro*, 686 S.W.2d 904 (Tenn.Ct.App.1984).

Many, if not most, of the cases dealing with the two rules are cases involving personal bankruptcies in which the issue concerned whether a refinancing destroyed the purchase money security status of the seller of a consumer item such as a TV set. In the absence of purchase money status the bankrupt debtor could retain the property under the exempt property rules. We do not find those cases of much benefit in dealing with this case. In those cases the dispute was between the seller and bankrupt buyer and the exempt property rules are to be liberally construed for the benefit of the bankrupt.

Here we deal with two secured creditors who did not deal with each other, but independently with a common debtor. Further there is no liberal construction rule present here.

■ We do not find it necessary to adopt either of the competing rules in this case. Section 400.1–102(2) states that the UCC's underlying purposes are "(a) to simplify, clarify and modernize the law governing commercial transactions; (b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; (c) to make uniform the law among the various jurisdictions." While lawyers and judges are wont to view statutes such as the UCC as existing for ·the resolution of litigation, we cannot lose sight of the fact that the major purpose and benefit of the UCC is to establish understandable rules for the conduct of commercial activities. Millions of transactions occur daily which are governed by the provisions of the UCC. An infinitesimal number ever reach litigation. The UCC provides the guidelines by which commercial activity occurs and the code is applied continually by non-lawyers in commercial activities. The UCC should be interpreted with that underlying practical fact in mind.

■ The requirements of the UCC concerning filing, notice and perfection all are intended to provide to those dealing with commercial activities knowledge of the status of the commodity with which they are dealing so that they may protect their interest and act in a commercially prudent manner. The status of a security interest should be determinable under the Code before another lender commits itself to providing additional funding to the debtor. In the case of a purchase money security interest a lending institution should be able to tell from the documentation whether a purchase money security interest is involved, the extent of that interest, how much of the payments which have been made have been applied to reduce the purchase money debt, and how much equity currently exists in the collateral covered by the purchase money security interest. As stated in *Southtrust Bank v. Borg–Warner Acceptance Corp.*, 760 F.2d 1240 (11 Cir.1985) l.c. 1243 "Unless a lender

contractually provides some method for determining the extent to which each item of collateral secures its purchase money, it effectively gives up its purchase money status." Loans can be made against the equity in merchandise covered by a purchase money security interest but only if the amount of that equity is clearly and easily determinable. Obviously, such equity can be readily ascertained if the security interest involved is the original purchase money security interest. Where the security interest covers not only the purchase money debt but additional debt having a lesser priority the equity in the collateral may not be readily apparent or easily determined.

■ Purchase money security interests are an exception to the usual "first in priority rule," and receive that status to encourage suppliers to furnish necessary commodities, equipment, machinery, etc. to businesses which may have borrowed from another source and have blanket security liens on all their property including after-acquired property. The purchase money exception protects borrowers from being tied to a single lender and reduces the potential unfairness created by monopolization of credit. Special Project, *The Priority Rules of Article Nine*, 62 Cornell L.Rev. 834, 870–871 (1977). But the treatment of purchase money security interests is an exception and as an exception the interest claiming that status must clearly appear to meet the requirements imposed.

■ We are not prepared to say that under no circumstances can purchase money debt and non-purchase money debt be combined in a single security interest document. We do conclude, however, that the "to the extent" language was intended to require that the instrument creating the purchase money security interest clearly delineate the respective debts involved, which item of collateral secures its purchase money, and the amount of the payments which are to be applied against each purchase money portion of the instrument. In the absence of such delineation the instrument does not meet the requirements of the "extent" to which it is purchase money security. With such delineation it becomes possible for other lenders, including lenders with blanket security interests, to advance money in reliance on the equity in the collateral.

■ The security agreement of December 27, 1988, does not meet the criteria we find necessary to qualify it as a purchase money security interest. The agreement sets forth the amount of each item making up the total amount of the indebtedness. It then credits trade-ins against the indebtedness total. The agreement does not provide any delineation of how payments are to be applied or against which indebtedness any portion of any payment is to be applied. A lender examining the document would have no way of knowing whether the collateral had any equity value over and above the purchase money lien and if it did what that equity value would be. The trial court correctly determined that Erb did not have a purchase money security interest in the collateral and that Bank's preexisting blanket security interest was superior.

■ We turn now to the trial court's award of damages. The parties have briefed at some length the question of whether Missouri or Illinois law applies to the award of damages. We find it makes no difference. The thrust of the Bank's position is that Erb had no right to sell the collateral and that in doing so it was guilty of conversion. Bank concedes that under Illinois law, as articulated in *Continental Bank of Buffalo Grove, N.A. v. Krebs*, 184 Ill.App.3d 693, 133 Ill.Dec. 157, 540 N.E.2d 1023 (1989), the Bank has no right to the proceeds of the sale. It contends, however, under Missouri law, as articulated in *Farmers State Bank v. Stewart*, 454 S.W.2d 908 (Mo. banc 1970) and *United States v. Gallatin Livestock Auction, Inc.*, 448 F.Supp. 616 (W.D.Mo.1978), Erb was guilty of conversion and Bank is entitled to the proceeds of the sale. Neither *Stewart* nor *Gallatin* involved a junior lienor. Both involved a situation where an auctioneer, acting on behalf of the owner of property which was mortgaged, sold the property. In both cases the court held that the owners of the mortgaged property had no right to sell the property and their agent who sold it on their behalf was guilty of conversion and the mortgagee was entitled to the proceeds.

Here the Bank never attempted to seize the collateral even though AmEarth was in

default. It never requested that Erb turn the collateral over to the Bank. Its only demands were that Erb return the property to AmEarth and that Erb pay the sale proceeds to the bank. Erb was a secured party, albeit an inferior secured party to the Bank. AmEarth was in default on its note and agreement with Erb. Section 400.9–503 provides that a secured party has the right to take possession of collateral *on default*. Erb was entitled to take possession of the collateral and sell it subject to the superior lien of the Bank. Section 400.9–504. That is what it did. Section 400.9–504 does not require or authorize application of the sale proceeds to satisfaction of a senior security interest. The issue is addressed in *Frierson v. United Farm Agency, Inc.*, 868 F.2d 302 (8th Cir. 1989)[2] as follows:

> [The superior lien holder] cannot refuse to exercise its rights under the security agreement, thereby maintaining [the debtor] as a going concern, while it impairs the status of other creditors by preventing them from exercising valid liens. Allowing [the superior lien holder] to do so would fly in the face of all Article 9, which is premised on the debtor's ability to exercise rights in the property. See § 400.9–311.

Erb exercised its rights to foreclose its security interest in the collateral. In doing so it was not guilty of conversion. The Bank was not entitled to the proceeds of the sales which presumptively represented Erb's interest in the collateral. The sales were necessarily made subject to Bank's interest in the collateral, which presumably Bank has and can enforce. The provisions of the UCC relied upon by the Illinois court in *Krebs, supra* are identical to the provisions in Missouri. We agree with the court's analysis. The court erroneously entered summary judgment for the amount of the proceeds of the sale.

The parties have raised a number of other issues including the validity of Erb's affirmative defenses, the commercial reasonableness of the sale by Erb, the issue of punitive damages, and the issue of prejudgment interest. In view of our holding that Bank was not entitled to the proceeds of the sales because Erb did not convert the property the issue of affirmative defenses is moot. Because the Bank is not entitled to damages it is also not entitled to prejudgment interest or punitive damages.

The commercial reasonableness of the sale has no consequence to the Bank. It has application only to lienors junior to Erb or the debtor who might have losses because inadequate proceeds were realized from the sale, not to a senior lienor who has no claim to the proceeds. Section 400.9–507. Bank contends that the commercial unreasonableness of the private sale extinguishes Erb's remaining rights to the other machinery making its actions in conducting the public sale a conversion. We find no legal support for that contention. Even if that were the law, conversion would be as to AmEarth not the Bank, which never requested possession of the collateral from Erb. While the Bank may have had a right to possession of the collateral, it never sought that possession from either AmEarth or Erb.

Declaration of superiority of Bank's security interest is affirmed. Judgment for the proceeds of the sale is reversed. Cause remanded for entry of judgments consistent with this opinion.

GAERTNER and RHODES RUSSELL, JJ., concur.