(55 P.3d 357)
No. 88,019

GUARANTY STATE BANK & TRUST CO. and the NORTH CENTRAL REGIONAL PLANNING COMMISSION, *Appellees*, v. VAN DIEST SUPPLY COMPANY, *Appellant.*

—

Opinion filed September 27, 2002.

*George P. Coughlin* and *Patrick J. Kaine*, of Dysart Taylor Lay Cotter & McMonigle, P.C., of Kansas City, and *Lance H. Cochran*, of Kennedy Berkley Yarnevich & Williamson, Chartered, of Salina, for appellants.

*Guy R. Steier,* of Frasier & Steier, of Beloit, for appellees.

Before GERNON, MARQUARDT and BEIER, JJ.

BEIER, J.: Defendant Van Diest Supply Company (Van Diest) appeals summary judgment in favor of plaintiffs Guaranty State Bank & Trust Co. (GSB) and the North Central Regional Planning Commission (the Commission) in their conversion action. We must decide whether Van Diest acquired a purchase money security interest that takes priority over the security interests of GSB and the Commission.

Both GSB and the Commission made loans to debtor Barnard Grain Company (Barnard). On May 24, 1994, GSB filed a financing statement with the Kansas Secretary of State, perfecting a security interest in certain collateral, including all of Barnard's inventory now and hereafter owned. GSB filed a continuation statement on March 17, 1999. On June 28, 1995, the Commission filed a financing statement perfecting a security interest in the same collateral. It filed a continuation statement on June 29, 1995.

Barnard eventually got behind in its payments to Van Diest for agricultural chemicals purchased in 1997. On January 20, 1998, Brad Hickenbottom, Van Diest's credit manager, met with Barnard's president, Tom King, and GSB loan officer Myron Wolken for the purpose of obtaining two things: payment of the outstanding balance due to Van Diest and King's signature on documents establishing Van Diest's purchase money security interest (PMSI) in any agricultural chemicals to be sold to Barnard in the future. King had talked to Wolken before the meeting to ensure funds were available from GSB to pay Van Diest.

King signed the documents prior to Wolken's arrival at the meeting. Testimony was conflicting on whether Wolken reviewed and approved the security documents after he arrived. Hickenbottom testified that Wolken did review the documents — a business security agreement, a guaranty, and a financing statement — and that the two of them discussed the documents and Barnard's financial condition. Wolken testified that he knew Barnard and Van Diest were doing business, but that he neither reviewed nor was asked to review the documents. King testified that the conversation

between Hickenbottom and Wolken was essentially an introduction and an exchange of pleasantries; he did not recall Wolken being asked to review any documents.

The Van Diest security agreement and its financing statement, filed January 26, 1998, covered

"[a]ll of debtor's property (including without limitation all inventory of agricultural chemicals and additives thereto) purchased or otherwise acquired from Secured Party; all cash and non-cash proceeds arising from or received upon the sale, exchange, or other disposition of such inventory or other property or of the proceeds thereof (including without limitation insurance proceeds payable by reason of loss or damage and returned or repossessed goods), whether such inventory, property or proceeds are now or hereafter acquired, existing or arising and wherever they may be located; and all substitutions therefore and additions and accessions thereto."

Neither the security agreement nor the financing statement contained the phrase "purchase money security interest."

Van Diest resumed selling agricultural chemicals to Barnard. As of November 22, 1999, the balance due was $31,872.14.

In December 1999, the board of directors of Barnard decided to start selling off its assets, and Van Diest deemed itself insecure as a result of conversations with King and Wolken. From February 22 to February 29, 2000, Van Diest removed approximately 536.5 gallons of chemicals, valued at $44,636.80, from the Barnard facility. Barnard knew about the removal and neither objected nor consented. Because Van Diest removed more chemical than it needed to cover Barnard's debt, Van Diest later sent a refund check to Barnard.

The Commission filed a release of its security interest on June 15, 2000. Three days later, GSB filed this action, alleging Van Diest committed a conversion when it removed the chemicals from Barnard's facility. It later moved to join the Commission as an additional plaintiff because the Commission had also held an allegedly prior security interest in Barnard's inventory. The district court granted the motion over Van Diest's objections.

Van Diest filed a motion for summary judgment, arguing it had a PMSI that took priority over GSB's security interest. GSB and the Commission then filed an amended petition, jointly claiming

their security interests were prior to Van Diest's. The amended petition specifically referred to the Commission's perfected security interest as evidenced by the June 29, 1995, financing statement; it did not reveal that the Commission had released its security interest the previous summer.

In its answer to the amended petition, Van Diest asserted plaintiffs' claims were barred by the doctrine of waiver; the Commission was not a legal entity and lacked standing to sue; plaintiffs' claims were inconsistent and in conflict with each other; and plaintiffs' counsel had a conflict of interest that precluded ethical representation of both plaintiffs.

Van Diest filed a motion to dismiss the Commission. The district court denied the motion, finding:

"2. Kansas has adopted the rule that the statutory authority to sue or to be sued need not be express, but can be implied. *Board of Library Directors v. City of Fort Scott*, 134 Kan. 586, 7 P.2d 533 (1932) held that the board of directors of the Fort Scott public library had standing to maintain an action in ejectment against the city of Fort Scott claiming title and possession to certain real estate. The court stated:

'The statute does not in express terms say that the board may sue and be sued. We do not think it is necessary that express power be given by the statute to authorize an administrative board to maintain an action in court where such board has the power to own and control property. (*Board of Park Commissioners v. Nashville*, 134 Tenn. 612.) The power to own and control property is nugatory unless the party vested with such power may call upon the courts to protect it in the ownership and use of such property. The board is a creature of the law-a legal entity-on which the statute confers powers and faculties which are of no force or effect unless it may vindicate the rights conferred in the courts.'

The rule in *City of Fort Scott* was repeated in dicta in *Lindenman v. Unscheid*, 255 Kan. 610, 628-29, 875 P.2d 964 (1994). See also, *NEA -Coffeyville v. U.S.D. No. 445*, 268 Kan. 384, 996 P.2d 821 (2000).

"3. Because plaintiff has the authority to own property it follows that it has standing to protect and recover its property."

GSB and the Commission filed a joint motion for summary judgment, arguing Van Diest did not have a PMSI because it failed to provide written notification to either the Commission or GSB as required by K.S.A. 84-9-312(3)(b). The district court agreed and granted the motion:

" 'Notification in writing to the holder of the conflicting security interest' means more than the holder having knowledge of the conflicting security interest, the knowledge must be communicated in a prescribed way, *i.e.* by written notice being delivered to the holder. See, *Wade v. Wade's Adm'r, et al.*, 81 Vt. 275, 69 Alt. 826 (1908)."

The court held that because Van Diest's security interest was perfected after the perfection of the security interests of GSB and the Commission, Van Diest's removal of the chemicals from the Barnard facility was a conversion. The court entered judgment in favor of GSB and the Commission in the amount of $44,636.80 plus interest and costs.

In this appeal, Van Diest continues to argue that it had acquired a PMSI in the chemicals it ended up removing from Barnard's facility because it properly complied with the notice requirements of K.S.A. 84-9-312(3), giving it priority over GSB. As for the Commission, Van Diest argues three points: (1) The district court's judgment is void because it awards a single amount to GSB and the Commission, who have conflicting claims; (2) the Commission, a voluntary, unincorporated association, was improperly joined as a plaintiff because it did not have the capacity to sue in its own name; and (3) the Commission had released its security interest before summary judgment was granted.

### *Adequacy of Van Diest's Written Notice to GSB*

K.S.A. 84-9-312(3) and (5) provide in relevant part:

"(3) A perfected purchase money security interest in inventory has priority over a conflicting security interest in the same inventory and also has priority in identifiable cash proceeds received on or before the delivery of the inventory to a buyer if:

(a) The purchase money security interest is perfected at the time the debtor receives possession of the inventory; and

(b) except where excused by K.S.A. 84-9-319, and amendments thereto, the purchase money secured party gives notification in writing to the holder of the conflicting security interest if the holder had filed a financing statement covering the same types of inventory (i) before the date of the filing made by the purchase money secured party or (ii) before the beginning of the 21-day period where the purchase money security interest is temporarily perfected without filing or possession . . .; and

(c) the holder of the conflicting security interest receives the notification within five years before the debtor receives possession of the inventory; and

(d) the notification states that the person giving the notice has or expects to acquire a purchase money security interest in inventory of the debtor, describing such inventory by item or type.

. . . .

"(5) In all cases not governed by other rules stated in this section (including cases of purchase money security interests which do not qualify for the special priorities set forth in subsections (3) and (4)), priority between conflicting security interests in the same collateral shall be determined according to the following rules:

(a) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection."

K.S.A. 84-9-312 is a "pure race" statute, and a secured party first in time to perfect its security interest has priority over any prior unperfected security interest. *J.I. Case Credit Corp. v. Foos,* 11 Kan. App. 2d 185, Syl ¶ 2, 717 P.2d 1064, *rev. denied* 239 Kan. 694 (1986). An exception exists, however, for a PMSI. If a purchase money creditor follows the requirements of K.S.A. 84-9-312(3), its interest, even if perfected later in time, takes priority over an earlier perfected security interest in the same collateral.

Van Diest argues it complied with the statutory notice requirement for acquisition of a PMSI during the January 20, 1998, meeting among Hickenbottom, King, and Wolken. Because there is evidence that GSB's representative, Wolken, reviewed and discussed the Van Diest security agreement and financing statement, Van Diest contends, notice of creation of a PMSI was sufficient. According to Van Diest, although the documents did not contain the term "purchase money security interest," they clearly informed GSB that Van Diest expected to " 'extend credit and grant other financial accommodations' " to Barnard and that Barnard granted Van Diest a security interest in " 'all inventory of agricultural chemicals and additives thereto purchased or otherwise acquired' " from Van Diest. Relying on *In re Daniels,* 35 Bankr. 247 (Bankr. W.D. Okla. 1983), Van Diest argues this language was sufficient to alert GSB "that a purchase money transaction [was] at hand."

In *Daniels,* the court considered whether a letter sent by the purchase money creditor to the financing creditor, stating the purchase money creditor was claiming a "security interest" rather than a "purchase money security interest" in certain inventory, was adequate notice under U.C.C. § 9-312(3)(b) and (d).

The court first noted that the Uniform Commercial Code, of which this section was a part, should be liberally construed to promote the underlying policies and purposes of the code, and the UCC comments indicated the section was designed for the protection of the prior secured creditor. Although the purchase money creditor did not use the term "PMSI" in this case, the court ruled "[t]he use of the terms 'furniture or fixtures now owned or hereafter acquired' and 'boats and motors now owned or hereafter acquired' should be clear indicators to a sophisticated commercial entity that a purchase money transaction is at hand." 35 Bankr. at 251. The court buttressed its conclusion by noting that no creditor other than one acquiring a PMSI is required to forward *any* notice to a prior secured party. In other words, the mere effort to provide notice was indicative of the classification of the later security interest. Compare *In re La Selle's Bicycle World,* 120 Bankr. 579 (Bankr. N.D. Okla. 1990) (finding PMSI with priority over earlier perfected security interest despite failure of notice; county clerk erred in telling PMSI creditor no earlier security interests existed).

Research has revealed no Kansas cases that address whether the notice required under the statute must contain the words "purchase money security interest." However, the Kansas Comment to K.S.A. 84-9-312(3), along with the plain language of the statute, appear to suggest inclusion is necessary:

"This subsection establishes a special priority rule for purchase money security interests in inventory. If the four hoops are jumped through, the purchase money security interest will prevail over a previously filed financing statement covering 'all inventory,' as to the inventory financed by the purchase money secured party. If the hoops are not jumped through, the prior filer will have priority under the 'first to file' rule of subsection (5). . . .

"In order to gain priority under this subsection, the purchase money lender must jump through four hoops: (1) the purchase money security interest must be perfected (normally by an executed security agreement and filing) by the time the

debtor receives possession of the inventory, and not one second later; (2) the supplier or third-party purchase money lender must give notification in writing to any competing security interest which has been previously filed; (3) the holder of the competing interest must receive the written notification within the five year period before the debtor receives possession of the inventory (i.e., the purchase money creditor must renew the notification every five years); and (4) *the notification must state that the purchase money creditor 'has or expects to acquire a purchase money security interest in inventory of the debtor, describing such inventory by item or type.'* " (Emphasis added.)

In addition, several cases from other jurisdictions have required strict compliance with these requirements to grant priority to a PMSI. See, *e.g., First Nat. Bank of Steeleville, N.A. v. Erb Equipment Co., Inc.,* 921 S.W.2d 57, 63 (Mo. App. 1996) ("[T]he treatment of purchase money security interests is an exception and as an exception the interest claiming that status must clearly appear to meet the requirements imposed."); *In re Superior Equipment, Inc.,* 195 Bankr. 77 (Bankr. C.D. Ill. 1996) (finding impossibility of compliance not recognized defense for purchase money creditor's failure to give written notice); *Steego Auto Parts Corp. v. Markey,* 2 Ohio App. 3d 200, 441 N.E.2d 279 (1981) (no statutory authority permits waiver of notice requirements); *Kimbell Foods Inc. v. Republic National Bank of Dallas,* 557 F.2d 491 (5th Cir. 1977) (purchase money creditor lost priority status by failing to provide the prior creditor with written notice, despite prior creditor's vague knowledge of purchase money creditor's loan, expectation of lien acquisition).

We also look to the stated policy behind the statute. The Official UCC Comment provides:

"The reason for the additional requirement of notification is that typically the arrangement between an inventory secured party and his debtor will require the secured party to make periodic advances against incoming inventory or periodic releases of old inventory as new inventory is received. A fraudulent debtor may apply to the secured party for advances even though he has already given a security interest in the inventory to another secured party. The notification requirement protects the inventory financer in such a situation: if he has received notification, he will presumably not make an advance; if he has not received notification (or if the other interest does not qualify as a purchase money interest), any advance he may make will have priority." K.S.A. 84-9-312, Official UCC Comment 3.

It follows that a PMSI creditor should make its intention to claim priority clear to earlier security interest holders. Permitting a PMSI holder to call its interest simply a "security interest" could mislead the earlier holder, leading it to assume it maintained its priority under the "first to file" rule and would be secure in making future advances.

In this case, Van Diest did not provide separate, explicit written notification to GSB of Van Diest's claim to a PMSI in Barnard's inventory. And, even if we accept Van Diest's version of the January 1998 meeting, *i.e.*, that GSB's representative reviewed and discussed Van Diest's security agreement and financing statement, neither document mentioned a PMSI in Barnard's inventory. To serve the purpose of the notification requirement, we hold that strict compliance with K.S.A. 84-9-312(3) is required to establish a PMSI that will enjoy priority over earlier perfected security interests. Absent the explicit written notice required, GSB's security interest took priority over Van Diest's under K.S.A. 84-9-312(5)(a), and Van Diest's removal of the chemicals from Barnard's facility was a conversion.

### Role of the Commission

As stated above, Van Diest raises three issues regarding the Commission's role in this lawsuit. Regardless of whether the Commission was a proper party below, however, the outcome of this appeal would not change.

At the time summary judgment was granted to plaintiffs, Barnard owed GSB approximately $300,000 and owed the Commission $96,000. There was no dispute between GSB and the Commission over which of them held the superior security interest. GSB had perfected its security interest in Barnard's inventory be fore the Commission perfected its security interest. Thus, under K.S.A. 84-9-312(5)(a), GSB's security interest has priority, and all of the $44,636.80 judgment must be applied to reduce Barnard's outstanding $300,000 debt. No amount will be left over to reduce the debt to the Commission, regardless of whether it was properly or improperly allowed to participate as a party plaintiff.

Affirmed.